LaRAMORe, Judge,
delivered the opinion of the court:
Plaintiff claims damages arising out of alleged breaches by defendant of a lump sum equipment contract. This contract called for the design and construction by plaintiff, according to defendant’s specifications, of two 125-ton ocean going cranes.
Plaintiff contends that it was misled by the plans and specifications furnished by defendant as to the quantity of steel it would have to furnish to construct the cranes. It also contends that defendant required “illegal changes” in the contract which it claims also resulted in an overrun of steel used.
This case arises out of a Navy Department contract for the construction of two 125-ton floating cranes.
Each crane was to be constructed so as to incorporate ocean-going characteristics and the ability to replace 16-inch gun barrels on battleships operating against the enemy in remote areas of the Pacific.
The Bureau of Yards and Docks of the Navy Department was designated to administer the “125 ton floating crane project” including the preparation of invitations to bid.
*696 Plaintiff was invited to bid on this so-called 125-ton floating crane project by an invitation to bid dated August 23, 1943. It was required that the bids in response thereto reach the Bureau by October 1, 1943. Accompanying the invitation to bid were the specifications and two schematic or outline drawings of the cranes and pontoons to be constructed. On one of the outline drawings there appeared a table entitled “Crane Data” which purported to show “estimated” and “approximate” weights of the component parts of the crane. Aside from the weights and counterweights and ballast, the table showed the total estimated weight of the crane to be 1,222,000 pounds, and of the pontoon to be 2,180,000 pounds.
By letter dated October 8, 1943, the plaintiff submitted its bid and offered to do the work, complete in accordance with the specifications and outline drawings accompanying the invitation to bid, at a price of $1,158,600. The plaintiff’s hid further stated in pertinent part as follows:
We are attaching with our bid duplicate copies of our drawings Nos. W-l, W-2, W-3, W-4, W-5 and W-6, illustrating assembly drawings of the crane, barge and stability calculations and weights of the different parts involved.
We believe that we can make delivery of the first floating crane complete in eight months and the. second two months thereafter * * *.
Plaintiff, by drawing No. W-5 accompanying the bid, purported to show the total weight of the proposed crane superstructure together with the rotating platform to be 1,200,054 pounds, exclusive of the counterweights.
In fact, however, the “W” drawings, even though drawn to scale, did not state the sizes and weights of the various members in the parts and sections of the crane. As shown on their faces they were drawings of the “general” assembly. The stability calculations in W-5 drawings concerned large segments and sections of the crane, and did not purport to cover the specification stresses on individual parts which would be determinative of weight.
By letter dated October 15, 1943, the Navy Department .accepted the plaintiff’s bid, assigned contract number NOy- *697 6303, gave notice to proceed and further stated in pertinent part as follows:
* * * The cranes shall be delivered, one on June 15,, 1944 and one on August 15,1944. The formal contract shall be executed on the Bureau’s standard form of lump sum equipment contract with such modifications therein as the Chief of this Bureau may determine proper under the particular circumstances, including the standard termination provisions which are also applicable to= this notice of acceptance and your right to proceed thereunder * * *.
The plaintiff and the defendant thereafter entered into a formal written contract, antedated October 18,1943, but executed by the plaintiff on January 12,1944, and by the Navy Department on January 19, 1944. The contract named the-Chief, Bureau of Yards and Docks, as the contracting officer, and further provided in pertinent part as follows:
ARTICLE 1. (a) Subject matter of purchase. — The Contractor shall furnish and deliver f. o. b. contractor’s Slant two floating cranes as called for by specification to. 11264 * * *.
Specification No. 11264 was the same specification that accompanied the invitation to bid.
By letter dated March 30,1944, the Navy Department terminated the provisions of the contract for fabrication and shop assembly of the two pontoons. Under date of July 29,. 1946, the Chief, Bureau of Yards and Docks, issued a change order, accepted by the plaintiff on August 6, 1946, which allowed an increase in the contract price of $21,944.12 on account of an increase in the width of the pontoons, a reduction of $80,700 because of termination of fabrication and shop assembly of pontoons and various minor increases and decreases which resulted in a net decrease in the contract price of $59,992.61.
The plaintiff completed the fabrication of the two cranes in the latter part of July 1945, and they were accepted by the Navy Department.
When completed, each of the crane superstructures with rotating platforms weighed (exclusive of counterweights) 1,678,783 pounds.
*698 Mr. Meyerstein, president of the plaintiff company, long before and during the contract period in question, understood that the Navy had not developed detailed designs and plans for constructing the cranes, and that the company awarded the contract would have to develop' its own design to meet the Navy specifications. Paragraph 1-12 of the specifications accompanying the invitation to bid clearly showed that the design of the cranes was to be performed by the successful bidder. The design requirements for the crane boom and rotating platform, as stated in paragraph 4-01 of the specifications, imposed three conditions, namely, (1) operational requirements, (2) crane roll stress due to 1/20 trochoid wave with boom extended, and (3) stresses due to wind action. There was ample information contained in the specifications and Navy drawings to enable the plaintiff to prepare a bid, and the time allowed for preparation-and submission thereof was reasonable and sufficient. No language regarding overrun of weight was requested by plaintiff or included in the contract although plaintiff was aware of this possible eventuality. Plaintiff carefully reviewed the proposed contract. The Navy specification drawings upon which plaintiff claims to have relied in arriving at its bid price were merely outline sketches which would not permit the calculation of stresses, sizes and exact weights of the various members of the cranes and, furthermore, plaintiff should have realized that it could not reasonably rely on the weight estimates contained in the specification drawings prepared by defendant.
The specifications used in the invitation to bid were the same as the specifications incorporated into the executed contract. Plaintiff’s “W” drawings, submitted with its bid proposal were never considered to be a part of the contract. In compliance with specification 1-12 plaintiff prepared and submitted to defendant detailed design drawings. Defendant’s representatives never undertook to change the basic design proposed by the plaintiff, but directed corrections thereof to meet specification requirements. However, defendant did point out to plaintiff’s chief engineer during design stages that there was an excessive use of diaphragms *699 between the sides of the boom, but no changes were made by the plaintiff in this respect in the design'resubmissions.
Plaintiff’s first contention is that defendant’s request for bids on the 125-ton floating crane project dated August 23, 1943, was misleading and amounted to a misrepresentation •of defendant as to the weight of steel required for the construction of the floating cranes. Plaintiff asserts that although it acted with due care in relying on said misrepresentations, it suffered damage. Plaintiff also argues in its brief that the drawings accompanying the invitation to bid were incorrect with respect to the calculation of freeboard and that this alleged error was an important misrepresentation. In support of the latter contention plaintiff cites the cases of Montrose Contracting Co., Inc., v. County of Westchester, 80 F. 2d 841; United States v. Spearin, 248 U. S. 132; City of New York v. Pennsylvania Steel Co., 206 Fed. 454.
In each of the above cases there were definite plans and •specifications amounting to representation of facts about which the defendant knew. Failure of the defendant to properly disclose the conditions under which the plaintiff was required to work, reasonably relied on by the contractors involved, directly lead to the loss sought to be recovered. This is not the situation in the instant case. Plaintiff here discovered the alleged error in the calculations of the freeboard prior to the submission of its bid, but did not notify the Navy and did not state any exceptions in its bid on account of it. This all notwithstanding paragraph 4 of the instructions to bidders which requested that errors “noted by intending bidders should be promptly reported to the office from which the bidding information was obtained for correction or interpretation before the date of the opening of bids.”
As to alleged misrepresentation by defendant regarding the weights of steel required, the only reference made to weight by the defendant was on an outline drawing numbered 271987 which accompanied the invitation to bid and the specifications. This drawing contained a subheading as follows : All weights and CG’s are estimated and are approximate only.” In addition, the drawings upon which plaintiff claims to have relied were merely outline sketches which gave *700 only the reaches of the cranes and dimensions of the pontoons. Certainly, under these circumstances, plaintiff could not have reasonably relied on the weight estimates shown therein. The evidence further shows that any competent engineer reviewing the Navy specifications and drawings-would have realized that the Navy drawings were only a general idea of a crane, that the successful bidder would be-required to develop a complete set of designs which would conform to the specifications, and that the weights estimated by the defendant could not reasonably be relied upon in-computing the bid.
Further, Mr. Meyerstein, prior to the time his company-bid on the floating crane contract, understood that the Navy had not developed detailed designs and plans for constructing the cranes, and that the company awarded the contract would have to develop its own design to meet the Navy specifications. Paragraph 1-12 of the specifications also provided: “Before commencing the fabrication of any of this-work, the contractor shall submit for approval drawings and calculations * *
Plaintiff was aware of the fact that weight of the cranes would depend upon design and specifications. Plaintiff' was also aware of the fact that, under the terms of the specifications it was to compute the weight of all materials to be used. In fact, what the Navy wanted was a crane which could be used under certain conditions and if it were so designed and built, weight was not an important factor. The design requirements for the crane’s superstructure and rotating platform imposed three conditions; i. e., operational requirements, crane roll stress caused by a 1/20 trochoid wave with boom extended, and stress due to wind action. There was ample information contained in the specifications and Navy drawings to enable plaintiff to prepare a bid, and the time allowed for preparation and submission thereof was reasonable and sufficient.
The rule is that where the aggrieved party knows the actual state of affairs, representations contrary to the fact cannot be construed as warranties. DuBois Construction Corporation, 120 C. Cls. 139, 169 and cases cited therein.
*701 Therefore, it is apparent that there is no merit in plaintiff’s claim on account of misrepresentation by defendant.
Plaintiff’s second contention is that in fabricating each •crane it was necessary to use 478,729 pounds of steel in excess of that required by the terms of the contract, because •of illegal changes defendant made in the contract, for which plaintiff should be compensated.
As to this contention plaintiff says the “W” drawings ■submitted with its bid proposal stated it was plaintiff’s considered opinion that each crane’s superstructure and rotating platform would weigh 1,200,054 pounds exclusive of -counterweights; that when completed, each crane’s superstructure and rotating platform would weigh (exclusive of •counterweights) 1,678,788 pounds, or 478,729 pounds per ■crane more than the weights shown on plaintiff’s W-5 tables which were submitted with its bid. It is the cost of this alleged overrun of weight which plaintiff seeks to recover in this suit.
The short answer to this contention is: Neither party intended that “W” drawings were to be a part of the contract, binding them as to the weights stated therein. The “W” drawings were described by plaintiff in its claim letter of February 25, 1946, as “preliminary drawings.” They were not detailed design drawings from which a crane could be built and showed only some of the individual members of the crane’s superstructure and none of the stresses on any of them. The provisions of the formal contract, not the preliminary drawings, governed the obligation of the parties. Union Paving Company v. The United States, 126 C. Cls. 478, 489; The Callahan Construction Co., 47 C. Cls. 177.
Defendant was to approve the plaintiff’s design before fabrication began, pursuant to paragraph 1-12 of the specifications. In this connection the Navy never undertook to ■change the basic designs proposed by the plaintiff, but directed correction thereof to meet the specific requirements.
Plaintiff says defendant’s refusal to permit use of the holddown devices resulted in an “illegal” change in the terms •of the contract causing the increased weight in the cranes which is sought to be recovered. The evidence on this point *702 shows that first, the horizontal thrust increased from about 248,000 pounds to about 700,000 pounds due to the 1/20 trochoid wave condition, with the boom extended longitudinally in operating position, and holddowns and tiedowns could not have absorbed stich stresses. Second, a competent engineer would have construed specification 4-01 (a) (2) as meaning that the stresses resulting from the conditions therein stated, could not have been met by the use of hold-downs, and that the crane boom itself would have to absorb such stresses. Third, the plaintiff’s chief engineer, Mr. Blackman, testified that the only holdowns considered by the plaintiff in the preparation of its bid were those eventually used; that the holddowns were intended to meet the stresses under specification 5-14 but not to absorb the stresses in the center castings under specification 4-05 (c) ; that the holddowns would not absorb horizontal load but only vertical load; and that the plaintiff originally planned to use shroud-line tiedowns. In this connection Mr. Black-man admitted that in a telephone conversation with the defendant’s attorney he had advised that Mr. Meyerstein had recently discussed with him the question of tiedowns and that he had told Mr. Meyerstein that he had no recollection of ever having planned to use tiedowns. Mr. Blackman further stated that he had never discussed tiedowns with any representative of the Navy, that the plaintiff had abandoned its plan to use tiedowns, and no design drawings were ever prepared for them. He also testified that it would not have been practical to use cables or shroud lines under the stress conditions of specification 4-01 (a) (2) because the “boom would be tip kind of high, and I wasn’t sure that we would get an angle on that rope line that would be worth very much. It was one of those things again that we would have to investigate later.” Fourth, Mr. Blackman testified that he never made any investigation of tiedowns at any time. Fifth, the basic design for the 125-ton cranes in suit was taken by the plaintiff from the design of the 50-ton crane which it had previously constructed for the Navy. No tie-downs were used on the smaller crane. Sixth, no mention was made by the plaintiff of holddowns or tiedowns in any *703 letter, claim or document or in any administrative proceedings. Seventh, holddowns were used in the cranes as built, to lock the rotating platform to the crane base. No tiedowns were designed or employed.
The evidence also shows and the commissioner of this court has found that the defendant did not negligently, carelessly, recklessly, or otherwise misrepresent the weights of the cranes; that the plaintiff did not reasonably or in fact rely upon the Navy’s weight estimate; that the defendant did not threaten, coerce, or exercise any undue influence upon the plaintiff with respect to the submission of design drawings; that the plaintiff voluntarily submitted design drawings which, when reasonably corrected by the defendant, resulted in the overrun of weight in the superstructures of the floating cranes involved in this case.
Therefore, in the light of the record it must be concluded that defendant made no “illegal” changes in the contract.
From all of the evidence in this case, it is apparent that the plaintiff could have designed and fabricated the superstructures of the floating cranes so that they would have been substantially lighter in weight and still have complied with the specifications, and particularly the stress requirements of the trochoid wave condition with boom at maximum radius.
Moreover, the weight of the evidence in this case is that it was practical and possible to design and build a superstructure for the floating crane, which would meet the specifications and stay within the estimated weights set forth on the Navy specification drawing. Plaintiff should not be permitted to recover for an injury which is due to its own fault. Ray O. Shaffer v. The United States, 128 C. Cls. 299, 313-314, cert. denied 348 U. S. 864.
Plaintiff’s third contention is that it recover the unpaid balance due under the contract in the amount of $41,275.75.
It is conceded by the Government that this sum is the unpaid balance on the contract. However, by notice of assignment dated August 28, 1945, the Eeconstruction Finance Corporation notified the Chief of the Bureau of Yards and Docks, Navy Department, that the moneys due or to become due under Contract No. NOy-6303, the contract under *704 ■consideration, bad been assigned to the Small War Plants Corporation pursuant to the provisions of the Assignment of •Claims Act of 1940.
Plaintiff’s counsel admitted at the hearing that such an assignment had been made and that the amount was owing to the Reconstruction Finance Corporation under the assignment and payment should be made to the Reconstruction Finance Corporation. Under these circumstances, plaintiff should not recover the unpaid balance due under the contract.
Therefore, plaintiff’s petition is dismissed.
Madden, Judge; Whitaker, Judge; Littleton, Judge/ •and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a New York corporation, having two plants at the time of the contract performance in this case, one located at Long Island City, New York, and the other at Ampere, New Jersey. The plaintiff had previously built ■one 50-ton capacity floating crane for the Navy Department, and its experience with cranes otherwise had been in the construction of twelve land-type or drydock cranes, ten of ■25-ton capacity and two of 50-ton capacity, for municipalities, for the Government, and for foreign countries. Anthony M. Meyerstein, a mechanical engineer, was the plaintiff’s president.
The term “ton” in every instance in this report means a long ton.
2. During 1943 the Navy Department decided to have constructed two ocean-going floating cranes to be towed to the South Pacific to be used in lifting into place on battleships new 16-inch gun barrels to replace those worn out in shelling island fortifications of the enemy. Regunning was requiring that a battleship be returned to Pearl Harbor to be out •of combat for a period of one to two months. The cranes were to be used to replace gun barrels near the scene of action.
*705 • 3. The preparation of the Navy specifications for the-flo'at-ing cranes was largely delegated to a Mr. John Wagstaff, an experienced design engineer in the Bureau of Yards and Docks, Washington, D. C. The main requirements of the cranes, later incorporated into.the specifications, were that they each be able to (1) lift 125 tons at a 100-foot radius, (2) withstand the stresses imposed by a %0 trochoid wave 140 feet long and 7 feet high, and (3) withstand the stresses caused by a 30-pound wind. A trochoid wave is any' wave having a constant relationship between its length and height. A y2o trochoid wave is one in which there is one foot of- elevation for each twenty feet of length, and it is equivalent generally to waves created by a mild gale. Mr. Wagstaff determined that the trochoid wave condition should be included in the specifications because the cranes were to be ocean-going, and because they would be operating in forward bases which might be unprotected and open to the sea. Inclusion of this condition was reasonable under the circumstances. The trochoid wave condition was not unusual, and had been described in naval textbooks. The 30-pound wind condition was the equivalent of about an 80-mile wind.
4. During the summer of 1943 while Mr. Wagstaff and others were preparing the Navy specifications, a thorough investigation was made of other similar cranes which had already been built. During this time Mr. Meyerstein was occasionally in Washington at Mr. Wagstaff’s office on business pertaining to other Navy contracts which he then had in progress, and general aspects of the forthcoming floating crane contract were discussed with Mr. Meyerstein. Mr. Meyerstein, however, prior to the time his company bid on the floating crane contract, understood that the Navy had not developed detailed designs and plans for constructing the cranes, and that the company awarded the contract would have to develop its own design to meet the Navy specifications.
5. Mr. Kobert L. Anderson, an engineer in the Bureau of Yards and Docks, Washington, D. C., was appointed administrator of the 125-ton floating crane project. He included the plaintiff on the list of those invited to bid. Other companies listed included the Dravo Corporation, Wellman En *706 gineering Company, and K. W. Kaltenbach Corporation, all experienced in designing and constructing cranes. The invitation to bid was mailed August 23,1943, and stated in part as follows:
You are invited to submit informal written bids for construction of two floating cranes in accordance with specification no. 11264 and the project drawings which are being forwarded to you under separate cover, enclosure (A).
It was required that the bids reach the Bureau at Washington, D. C., not later than 11:00 a. m., October 1,1943.
6. The specifications accompanying the invitation to bid, later made a part of the contract with the plaintiff, in their pertinent parts provided:
1-03. Delivery. — The cranes shall be delivered, packed and prepared for export shipment, f. o. b., contractor’s plant.
1-08. Government work and material, — The Government will transport the cranes from the point of delivery, will erect the cranes, will furnish and install the counterweight material in the machinery house and ballast material in the pontoon, will test the cranes after erection, and will do the finish painting.
1-09. Drawings accompanying specification.. — The following drawings accompany this specification and will form a part of the contract. Wherever “as shown,” “as indicated,” “as detailed,” or words of similar import are used, it shall be understood that reference to these drawings is made unless stated otherwise. Drawings are the property of the Government and shall not be used for any purpose other than that contemplated by the specification.
Drawing
no. Title
271987 125-ton floating cranes
280687 125-ton floating cranes
1-10. Standard specifications,. — Except where modified by this specification and/or its accompanying drawings, the standard specifications given in the following list shall govern in all cases where references thereto are made. Especial care shall be exercised to refer in requests for quotations, in orders, and in subcontracts to these standard specifications and to any modifications *707 thereof. Wherever “as amended” is used hereinafter with reference to standard specifications, it shall be understood to refer to the amendments and errata mentioned in the following list.
12Yb Sept. 1934 Standards of design for structural steel, including supplement no. la thereto and addenda nos. 2.
1-12. Inspection and approval of drawings. — Before commencing the fabrication of any of this work, the contractor shall submit for approval drawings and calculations as follows:
(1) General arrangement drawing of entire crane showing side and end elevations of crane and pontoon, machinery house floor plan, clearances, hook lifts and radii at maximum and minimum radii and important controlling dimensions for each specified maximum radius;
(2) Arrangement drawing of pontoon and design calculations; ''
■ ' (3) Drawing .showing loads and the center of gravity of the entire crane under dead load plus full hook load at maximum radius, and under dead load, hook at minimum radius, and 30-pound head wind;
(4) Arrangement drawing showing the jib, luffing screws, hoisting ropes, sizes of sheaves, rope leads, kind •and number of parts of rope, size of bearings and loads;
(5) Arrangement drawing of the machinery house showing all machinery, controls, and other equipment, clearances, windows and doors; access platforms, openings, and roof and side framing;
(6) -Arrangement drawing and design calculations for each separate hoisting, luffing, and rotating mechanism and capstans showing sizes of and loads on gears, reducers, shafts, bearings, couplings, brakes, turntable rollers or truck wheels; speeds of the parts; materials; stresses in the mechanism and the structural parts designed for stress;
' (7) ' Stress sheets of jib, A-frame, turntable, and travel base showing and tabulating stresses and sections; and king pin and center steadiment showing loads, sizes and stresses; ■
(8) Torque, speed, and time curves for rotating and luffing mechanisms;
(9) Arrangement of ladders, platforms,- and walks showing size, material and clearances;
.(10) Stability drawing showing weights and centers of gravity (horizontally and vertically) of all principal parts of the crane; wind area and their centers of gravity *708 (horizontally and vertically) of jib and rotating structure, side and end, and showing the stability of the rotating structure, the entire crane, and the'jib; and pontoon lists, trims, and freeboards under operating, test, and wind conditions;
(11) Five copies of all purchase orders for electrical equipment showing make, size, type, and rating; manufacturers wiring diagram of each panel; general wiring diagram showing make, size, type, and rating of motors, controls, master switches, resistors, and_ other major pieces of equipment, size and type of wire, manufacturers drawing numbers of all panels, control and motor manufacturers requisition numbers or general order numbers; and characteristic curves of all motors; and
(12) Swing clearance diagram showing the required front and rear clearances (vertically and horizontally) at all points in swinging.
The drawings described in (1) to (12) hereinbefore shall be submitted in the form of prints in duplicate and each shall have indicated thereon the contract and specification numbers. If approved, one set of such prints will be returned to the contractor with such changes or corrections noted and the contractor shall resubmit changed or corrected prints in duplicate. Approval of the contractor’s drawings is a general approval relating only to their sufficiency and compliance with the intention of the contract and shall not excuse or constitute a waiver of errors, discrepancies, or omissions. One print of each detail drawing when completed shall be submitted to the Bureau for reference and review. Six copies of the following shall be furnished the Bureau for its records: Prints of approved drawings described in (1) to (12) hereinbefore, all detail drawings, and manufacturers outline drawings of motors, reducers, brakes, panels, master switches, limit switches, and similar parts; and complete instruction books on operation, care, lubrication, and adjustment of all parts of the crane. The cranes will be subject (1) at the factory, to surface inspection and also any detailed inspection which may be considered necessary by the Inspector of Naval Material, and (2) after erection, surface inspection and operating tests.
1-14. Approval by contracting officer. — Where “as directed”, “as required”, “as permitted”, “approved”, “acceptance”, or words of similar import are used, it shall be understood that the direction, requirement, permission, approval, or acceptance of the contracting officer is intended unless stated otherwise.
*709 2-02. Functions. The cranes shall have the functions of hoisting, luffing, and rotating at the speeds and loads specified hereinafter. These functions shall be performed on either.hoist separately; or a combination of any two functions desired for any load within the specified capacities, except-that simultaneous luffing up and hoisting of maximum load will not be required. The cranes will be required to handle only one hoist load at the same time.
2-03. Capacities, lifts, and speeds. — The term “ton” as used herein is 2,240 pounds. The radius shall be the horizontal distance from the center of the hook to the point of intersection in the plane of the water surface of the longitudinal and transverse center lines below the turntable center steadiment. The cranes shall be capable of handling separately the following working loads: On main-hoist hook, 125 tons at a maximum radius of 100 feet and 112 tons at a maximum radius of 120 feet; and whip-hoist hook, 5 tons at a maximum radius of 140 feet. The maximum operating position of the jib with or without load shall be the position when the main-hoist hook is at the 110-foot radius. The minimum radius of the main-hoist hook shall be 50 feet. The contractor shall determine the hook capacities for all positions of the jib from minimum to maximum radii. The maximum and minimum radii specified shall be obtained with loaded or empty hook. The lift above water line with full-load on the hook shall be not less than the following: main-hoist hook at 100-foot radius, 90 feet; auxiliary-hoist hook at 120-foot radius, 117 feet: and whip-hoist hook at 140-foot radius, 123 feet. All hooks shall be capable of working to 25 feet below the water line at any radius from the maximum to the minimum. The average speeds for the total lifts or travels or one revolution, from start to stop, obtained under normal operating conditions, shall be as follows:
Main-hoist hook with 126-ton load— 10 ft. per min.
Auxiliary-hoist hook with 16-ton load_40 ft. per min.
Whip-hoist hook with 6-ton load_120 ft. per min.
Luffing of jib with 125-ton load on the main-hoist hook from the 100-f<jot to 50-foot radius_4 minutes
Rotating, one complete revolution, with 125-ton load on the main-hoist hook at the 100-foot radius— 3 minutes to 3 minutes 40 see.
*710 2-10. Assembly and preparation for shipment and erection. — The cranes shall be shop assembled. The base and turntable including the hoisting and rotating mechanisms shall be assembled in a unit. The luffing mechanism shall be assembled to the connecting members of the A-frame and jib. The pontoon, A-frame, jib, and machinery house may be assembled separately. The assembled turntable unit shall be adjusted and tested for operation. Rivet holes for field connection of main members shall be reamed or drilled when shop assembled ; likewise, welded field connections shall be match-marked. The cranes shall be disassembled in the minimum number of pieces practicable for ocean shipment. Ropes shall be of the proper length and one end shall be socketed. All pieces and parts shall be prepared properly for ocean shipment. Small pieces and parts shall be boxed or crated. Each piece, box, or crate shall be marked distinctly with weatherproof markings for proper identification and for ready erection. Different color markings shall be used for each crane.
3-02. Freeboard and inclination. The pontoon shall have a freeboard of not less than 2 feet when lifting the maximum test load at its maximum radius in any direction with no wind. The floating crane shall be stable Tinder 30 pounds per square foot horizontal wind pressure in any direction for either loaded or unloaded condition. The list with the main-hoist hook at the 100-foot radius shaE be not more than 1 degree 15 minutes with no load and not more than 5 degrees with 125-ton load. With a 25-ton load on the main-hoist hook, there shall be no list with the jib over the side in the transverse position and there shall be no trim with the jib forward in the longitudinal position. The wind pressure shall be computed in accordance with standards of design no. 12Yb as amended.
4-01. Structural design. — Loads, unit stresses, and all details of structural design shall be in accordance with Bureau of Yards and Docks standards of design no. 12Yb and supplement no. la thereto both as amended by addenda nos. 2, except as modified herein. The following unit stresses in pounds per square inch shall be used:
For structural alloy steels as approved, half the elastic limit but not to exceed 24,000.
For jib hinge plates, 18,000.
For sheave pins, boom hinge pins, boom topping pins, and other pins whose load varies in direction and intensity, 14,000.
*711 The cranes shall be designed for the following load combinations. Impact shall be considered as an overload on the hook.
(a) Jib, A-frame, and rotating platform.
(1) Dead load, live load, 5 percent impact, uniform acceleration caused by rotation from standstill to full speed in 8 seconds, and vertical and lateral loads caused by list and trim.
(2) Dead load, 30-pound wind from side and roll caused by waves 140 feet long and 7 feet high (%0 tro-choid wave), jib at maximum radius (unit stresses increased %).
(3) Dead load and 30-pound wind from end, jib at minimum radius.
(b) Rollers.
(1) Dead load, live load, and 10 percent impact.
(2) Dead load and 30-pound wind from end, jib at minimum radius.
The roller load may be considered as distributed over not more than one-half the total number of rollers, % to the front and 14 to the rear. The load on each set of rollers, front and rear, may be considered as distributed about the center of gravity of each set of rollers.
(c) Base and hold-down devices.
(1) Dead load, live load, 10 percent impact, and uniform acceleration caused by rotation from standstill to full speed in 8 seconds.
(2) Dead load, 30-pound wind from side, and roll caused by waves 140 feet long and 7 feet high (%o tro-choid wave), jib on rest (Unit stresses increased ^).
(3) Dead load and 30-pound wind from end, jib at minimum radius.
4-05. Turntable.
(c) Center castings and king pin. — The center castings and the casting for the support of rotating pinion shaft shall be turned to fit into the horizontal plates, bored to fit, and secured to the top and bottom flanges of the supporting beams. The plates shall be secured with body-bound bolts in the holes drilled after assembly. The center castings shall be male and female, shall be easily removable, and both shall extend the full depth of the supporting framing. A king pin shall be provided for additional safeguard in case of excessive overload. It shall be adequately connected to the base, and shall be hollow to permit installation of electric cables. The king pin shall be of forged steel; it shall have strength sufficient to take the loads caused by roll *712 ing without exceeding a stress of 30,000 pounds per square inch. The bearings for the center and. king pin shall be bronze bushed and shall each be provided with an oil reservoir. In calculating the strength and stability of the cranes, the king pin shall not be considered as resisting any over-turning moment other than that caused by rolling loads.
5-14. Locking and hold-down devices shall be provided for locking and holding-down the rotating structure to the supporting structure. The locking devices shall be of strengths sufficient to hold against a wind pressure of 40 pounds per square foot; shall be of the vertical spud type, shall be operated from the operators’ stand, and shall be interlocked electrically with the rotating motor control. The electrical interlock shall be by-passed through a push button. The hold-down devices shall be designed to be used when the crane is being towed at sea and shall be sufficient to hold the rotating structure to the supporting structure against rolling from a %0 trochoid wave, in quartering or in the trough.
10-01. Conformance with bidding data. — Unless specifications to the provisions of the bidding data are mentioned in a bid, it shall be assumed that the bid is wholly in accord with the bidding data.
10-02. Items of bids. — Bids shall be submitted, in duplicate, by letter and in accordance with Y & D form no. 190a? upon the following items:
Item L Price for the entire work, complete in accordance with the drawings and specifications, and the time for completion.
7. The Navy drawings which accompanied the specifications were numbered 271987 and 280687 and showed schematic or outline drawings of the crane and pontoon to be constructed.
Drawing 280687 showed the crane in the position it would be in lifting 125 tons at the minimum radius of 50 feet.
Drawing 271987 showed an outline plan of the pontoon and crane from overhead with the boom extending directly over the front end of the pontoon. It also showed an end elevation drawing of the pontoon with the boom extending over the side at 100-foot radius, representing the pontoon list and crane position upon the lifting of a 125-ton load. Also depicted was a side view of the crane and pontoon in outline with the boom extending longitudinally over the *713 front end of tbe pontoon and supported on tbe boom rest in towing position.
Drawing 271987 also showed tbe pontoon dimensions to be 140 feet in length, 75 feet in width and 14 feet in depth. At each end of the pontoon, there was shown a sheer or rise in the sides of the hull which made either end of the pontoon two feet higher than the sides. The sheers commenced at points on the sides about 35 feet from the bow and 20 feet from the stern.
Drawing 271987 further showed small overhead sketches of the crane and pontoon. Stated thereon were the degrees of list and figures indicating drafts of the hull when the boom was extended over the side at various radii and supporting various loads. One sketch showed the boom extending over and at right angle to the port side, and on the assumption that the boom was at 100-foot radius with a 125-ton load, the drafts on the hull were stated to be 11.8 feet at the aft end of port side, 10.9 feet at the fore end of port side, 4.2 feet at the aft end of starboard, and 3.2 feet at the fore end of starboard.
On drawing 271987 also appeared the following table:
CRANE DATA

*714 Mr. Wagstaff prepared the estimates of weight contained in the foregoing table. In doing so, he considered two previously built floating cranes of 100- and 150-ton capacity, some recently completed 75-ton portal cranes, and an existing estimate for an 85-ton portal crane. He determined the foot-ton capacity of each crane by multiplying its maximum load in tons by its maximum radius in feet. On the premise that the weights of boom-type cranes are generally proportionate to their foot-ton capacity, he reached the foregoing estimates of the weights of the parts of the cranes to be built under the pending specifications.
Aside from the weights of the counterweight and ballast, the total estimated weight of the crane in the foregoing table was 1,222,000 pounds, and of the pontoon was 2,180,000 pounds.
8. The Instructions to Bidders provided in their pertinent parts as follows:
1. Preparation of bids. — Bids will be submitted in letter form, in duplicate. Each bidder must make his own estimate of the quantities of materials and amount of work involved and of the facilities and difficulties attending the performance of the proposed contract, including local conditions, uncertainty of weather, and all other contingencies. All designations and prices shall be fully and clearly set forth. Copies of the bids shall be identical. Disclosure of details or extent of work other than for purposes connected with the preparation of the bids shall be avoided. Government drawings and specifications should not be included with bids.
4. Correction of errors. — Bidders are expected to read the drawings and specifications with special care and to observe all their requirements. Discrepancies, ambiguities, errors, or omissions noted by intending bidders should be promptly reported to the office from which the bidding information was obtained for correction or interpretation before the date of the opening of bids.
9. Navy Department Standards for Design for Structural steel, No. 12Yb, referred to in paragraph 1-10 of the specifications, provides in part as follows:
5-01. Minimum thicknesses of material stated herein shall govern except where greater minimum design thicknesses are specified elsewhere. Webs of beams and channels, shell plates of tanks and chimneys, bottom *715 plates of tanks (not including sketch plates), members m radio towers less than 200 feet high, hand-rails, floor plates not supporting machinery, members in crane cages and machinery houses, and window framing shall be not less than *4 inch thick. Roof plates of tanks shall be not less than %6 inch thick. All other material shall be not less than %6 inch thick.
5-02. Limiting lengths of members. — Lengths of compression members shall be taken as the distance center to center of pins or of riveted connections, except that in buildings, lengths of columns shall be considered as equal to the story heights. For beams and girders, the span shall be considered as the distance between the centers of gravity of the sections into which they frame or by which they are supported; for traveling structures, the span shall be considered as the distance center to center of rails or of tracks. The ratio of the unsupported length of the horizontal projection of riveted tension members (including bracing) to the radius of gyration about the horizontal axis shall not exceed 200. The ratio L/b for beams and girders shall not exceed 40. For cranes, the ratio L/r shall not exceed 100 for main compression members and 120 for bracing and secondary members; for all other work, this ratio shall not exceed 120 for main compression members, 150 for main bracing struts, and 180 for secondary bracing struts carrying no computable stress. For revolving cranes, the horizontal projections of riveted tension members used to determine the ratio L/r shall be the largest that can be obtained for any operating position.
10. There was ample information contained in the specifications and Navy drawings to enable the plaintiff to prepare a bid, and the time allowed for preparation and submission thereof was reasonable and sufficient. By letter dated October 8, 1943, the plaintiff submitted its bid and offered to do the entire work, complete in accordance with the drawings and specifications (see specification 10-02, item 1) at a price of $1,158,600. The plaintiff’s bid further stated in pertinent part as follows:
We are attaching with our bid duplicate copies of our drawings Nos. W-l, W-2, W-3, W-4, W-5 and W-6 illustrating assembly drawings of the crane, barge and stability calculations and weights of the different parts involved.
We believe that we can make delivery of the first floating crane complete in eight months and the second two *716 months thereafter. However, we cannot accept your clause No. 1-07 of the specifications providing for lic[ui-dated damages in the event of late delivery as we believe that this matter is beyond our control at this time. We also specify that each crane is to be shipped as soon as it is ready as no storage facilities are available at our plant.
Any taxes which the seller may be required to pay or collect, under any * * * future law, upon or with respect to the sale, purchase, delivery, storage, processing, use, consumption or transportation of any of the materials covered hereby, shall be for the account of the buyer, who shall promptly pay the amount thereof to the seller upon demand.
11. The plaintiff’s drawings submitted with its bid proposal, showed by drawing W-l, the general assembly of the crane with the boom at maximum radius; by W-2, the general assembly of the crane with the boom at minimum radius; by W-3, the general assembly of the crane with the boom on the boom rest in towing position; by W-4, the arrangement of machinery in the house on the rotating structure; by W-5, several tables of stability calculations, giving the weights of various sections or parts of the crane, itemized as follows:

Pounds

Revolving Frame_ 202, 900
Machinery House- 68,000
Engine Generator- 54,600
Counterweight Box- 28, 000
“A” Frame_ 150, 000
Luffing Mechanism_ 94,000
Main Hoist_ 46, 000
Auxiliary Hoist_ 23, 000
Whip Hoist_ 14,300
2 Rotate Mechanisms_ 30, 500
Rollers, Paths & Pintle- 36,000
Elect. Control Equip, Wire, etc_ 10, 000
2 Bull Pinions, etc_ 8, 500
Operator’s Cab_ 4,400
Ladders & Platforms_ 29,000
Lighting Generator_ 4, 000
Fuel Tank_ 1,180
Heater_ 255
Air Tank_ 305
Boom, Complete_184,100
Bull, Gear & Rollers_ 81,000

*717
Pounds

Pintle or Roller Plate- 64,694
Crane Base_ 61,000
Boom Rest_ 4,320
which, when added together, showed the proposed crane to weigh. 1,200,054 pounds, exclusive of the counterweight.
Plaintiff’s W-6 drawing showed the general assembly of the barge or pontoon, both in plan and elevation, and used the dimensions supplied by the defendant. It showed the length, width and thickness of the steel members. The weight of the pontoon was not set forth on the drawing, but sufficient information was shown to enable a competent engineer to compute what the proposed pontoon would weigh. The plaintiff’s calculation was that the barge would weigh 1,390,744 pounds, exclusive of the ballast.
12. By letter dated October 15,1943, the Navy Department accepted the plaintiff’s bid proposal and gave notice to proceed as follows:
This will constitute notice of the Government’s acceptance of your proposal for two 125-Ton Floating Cranes dated 8 October 1943 insofar as mechanical and technical features of the cranes are concerned and including the elimination of liquidated damages and including future sales use or processing taxes and at the price of $1,158,600.00. The cranes shall be delivered, one on June 15,1944 and one on August 15,1944. The formal contract shall be executed on the Bureau’s standard form of lump sum equipment contract with such modifications therein as the Chief of this Bureau may determine proper under the particular circumstances, including the standard termination provisions which are also applicable to this notice of acceptance and your right to proceed thereunder. The contract number assigned is NOy-6303.
You are requested to proceed under the authority of this notice pending execution of the formal contract.
13. The plaintiff and the defendant thereafter entered into a formal written contract, antedated October 18, 1943, but executed by the plaintiff on January 12, 1944, and by the the Navy Department on January 19, 1944. The contract designated NOy-6303, named the Chief, Bureau of Yards and Docks, as the contracting officer, and further provided in pertinent parts as follows:
*718 ARTICLE 1. (a) Subject matter of purchase. — The Contractor shall furnish and deliver f. o. b. contractor’s plant two floating cranes as called for by specification No. 11264 * * * and in accordance with Bid Item 1 of Section 10-02 of said Specification, said cranes to be delivered, packed and prepared for export shipment as stated in the aforesaid Specification (particularly Section 2-10 thereof).
(b) Said work shall be performed in strict accordance with (1) the specifications, schedules, drawings and other provisions of said Specification * * *.
(c) For the strict and faithful performance of all its undertakings hereunder, the contractor shall be paid the consideration of One Million, One Hundred Fifty-eight Thousand, Six Hundred Dollars ($1,158,600.00)
(d) Said work shall be commenced as promptly as possible and one of the floating cranes covered by this contract shall be delivered on or before June 15,1944 and the other floating crane covered by this contract shall be delivered on or before August 15, 1944.
(e) No liquidated damages shall be assessed * * *.
ARTICLE 2. Changes. — The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in any of the drawings, specifications or designs, and in the shipping, packing and delivery provisions. If such changes cause an increase or decrease in the cost of performing this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall.be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive, consider and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined in accordance with the article hereof entitled- “Disputes”, but in any event the Contractor .shall give immediate effect to the ordered change. ,
ARTICLE 19. Discrepancies. — Any discrepancy, conflict or inconsistency in or between the provisions of incorporated specifications, drawings, designs, said “General Specifications for Inspection of Material”, or other terms of this contract, and which is not disposed of by any other provisions of this contract, shall be imme *719 diately drawn to tire attention of the Contracting Officer whose determination as to the provisions which should govern shall be conclusive upon all parties.
ARTICLE 20. Oral Modifications. — No oral statement of any person whomsoever shall in any manner or degree modify or otherwise affect any of the terms of this contract.
ARTICLE 22. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Contractor within 30 days to the Secretary of the Navy or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
ARTICLE 26. Termination for Convenience of Government. — Should the Government determine it to be in the public interest to terminate in whole or in part the work provided for in this contract, it may do so by written notice from the Contracting Officer to the Contractor and to the extent and manner specified in such notice or in written supplements thereto. The Contractor shall promptly comply with all written instructions of the Contracting Officer in the premises, whether contained in such notice or subsequently given and including, without limitation, all instructions as to the disposition of subcontracts and purchase orders and the transferring to the Government of work and material in process. * * *
ARTICLE 29. All rights and obligations of the parties hereto, arising under Notice of Award dated October 15, 1943, sent by the Contracting Officer’ to and accepted by the Contractor, are superseded by and merged into this contract, and all proper acts of the contractor under said Notice of Award shall be deemed, to have been under this contract. '
14. By letter dated March 30,1944, the Navy Department terminated the provisions of the contract for fabrication and shop assembly of the two pontoons, and stated further as follows: - •
The Bureau has found it necessary to have the pontoons completely fabricated, erected and launched on the East Coast in lieu of shipping them knocked-down as contemplated by the contract. The Bureau has determined that interests of the Government will be best served by *720 haying the erection of and the fabrication of the material for the pontoons done by a separate contract and has made arrangements with the Chicago Bridge and Iron Company, Chicago, Illinois to perform the work.
It is directed that all materials to be furnished by you for the pontoons, including structural steel plates and shapes, fittings such as bitts, bollards, cleats, chocks, hatch covers, etc., be shipped to the:—
Officer-in-Charge of Contract NOy-7386
c/o Chicago Bridge and Iron Company,
Newburgh, New York
The materials such as pumps, motors, capstans, lighting fixtures, machinery or equipment are to be held at your plant pending further instructions.
The reduction in contract price by reason of this change, will be determined by a Board on Changes, and you are requested to nominate a member of your firm to serve on this Board.
15. Under date of July 29, 1946, the Chief, Bureau of Yards and Docks, issued a change order, accepted by the plaintiff on August 6,1946, allowing an increase in contract price of $21,944.12 on account of increase in width of pontoons, a reduction of $80,700 because of termination of fabrication and shop assembly of pontoons, and various minor increases and decreases on items irrelevant to this case, with a resulting net decrease in the contract price of $59,992.61.
16. The plaintiff completed the fabrication of the two cranes in the latter part of July 1945, and they were accepted by the Navy Department. Under date of October 6, 1950, the Comptroller General certified that final settlement under the contract was made July 29,1946.
The parties stipulated at the trial that the unpaid balance on the contract, exclusive of the plaintiff’s claim for excess steel added to the cranes, amounts to $41,275.75. As a part of the stipulation, the attorneys stated as follows:
Mr. Levine : [Attorney for plaintiff] The amount is $41,275.75.
Mr. StjndltjN : [Attorney for defendant] It is so stipulated. My stipulation on that amount is qualified to this extent, that we do not stipulate that it is owing to Anthony M. Meyerstein, Inc., but rather that it is owing to the Reconstruction Finance Corporation under an assignment.
*721 Mr. Levine : I don’t think that ought to be brought in here, because the assignment to the Reconstruction Finance Corporation has nothing to do with the determination of what is due under the contract. When the payment is made, it will automatically go to the RFC. The Government would not pay it to us; it would pay it to the RFC.
Mr. Sundlttn : We have been served with notice that an assignment has been made, and we recognize that any amount due and owing under the contract is.due to the assignee; and it is true that the amount stipulated, is owing under the terms of the original contract, exclusive of any additional claim, but in view of the assignment, I don’t think I could stipulate it is owing to the plaintiff corporation.
Mr. Levine: I am asking for a concession that the unpaid balance due under the original contract, exclusive of the claim for excess steel involved in this action, is the sum stated.
Mr. Stjndlun : It is so stipulated.
Mr. Levine : I would like to have eliminated the matter of the RFC, because I have an understanding with the RFC about it.
There is no other evidence iff this record on the matter of assignment of the unpaid balance of the contract price.
17. When completed, each of the two cranes weighed (exclusive of the counterweight) 1,678,783 pounds, or 478,729 pounds per crane more than the weights shown on the plaintiff’s W-5 tables, or 456,783 pounds per crane more than the weights shown in the table on the Navy specification drawing. Because of this overrun on weight, all of which is made up of steel above that expected to be used by the plaintiff, the plaintiff seeks to recover damages in the sum of $264,424.62 for the additional work and 957,458 pounds of excess steel used on the two cranes.
18. The plaintiff by its petition claims that the defendant negligently, carelessly, and recklessly prepared the weight estimates set forth in the Navy specification drawing; that the defendant intended or well knew that bidders would rely thereon; that the plaintiff was dependent upon and relied" upon the false representations as to steel required; that the plaintiff submitted a bid proposal and drawings which were sufficient to comply with contract requirements and which *722 were accepted by the defendant; that the defendant breached the contract by requiring the plaintiff to increase the weights of the cranes and sizes of the pontoons; and that by the defendant’s false representations and illegal demands the plaintiff was required to fabricate each crane with 478,729 pounds of steel in excess of that represented by the contract, specifications and contract drawings.
The plaintiff further contends (1) that Navy directives to make changes in the plaintiff’s designs for the cranes, together with a prohibition against use of holddown devices to absorb trochoid wave stresses, resulted in the added weight in violation of the contract provision that the wave stresses were to be met by use of holddown devices; and (2) that the plaintiff’s “W” drawings submitted with its bid proposal were contract documents binding the parties as to the weights shown thereon.
In prosecuting its claim administratively, the plaintiff contended that the excess steel was required to meet the stresses caused by the trochoid wave condition in the specifications, that the additional stresses (over and beyond operating and wind stresses) were unexpected by both parties, and that the contract was thus entered into under a mutual mistake of fact. The plaintiff now contends that this latter position was forced upon the plaintiff by threats made by representatives of the Bureau of Yards and Docks.
19. The defendant claims (1) that the plaintiff’s failure to correctly anticipate the stresses caused by the trochoid wave condition was its own fault; (2) that the plaintiff’s design was not efficient, and that the cranes could have been built :at much lesser weights; (3) that no directions to change plaintiff’s designs were made, but that all corrections made were in accordance with the procedures set out in Section .1-12 of the specifications, and all necessary and reasonable in order to make the plaintiff’s design comply with the specifications; (4) that contrary to the claim of the plaintiff, there were no unreasonable delays in approving the plaintiff’s drawings; (5) that the Navy drawings did not amount to a . misrepresentation because no reasonable contractor would ever have relied on the weights shown thereon, that the plaintiff did not rely thereon, and that, in addition, the cranes *723 could have been built at the Navy weights and met the specifications if the plaintiff’s design had been better; (6) that the plaintiff never planned to use holddowns to absorb the stresses caused by the trochoid wave; and (7) that the “W” drawings were abandoned with the making of the formal contract.
20. The specifications required that each of the floating cranes be capable of lifting a test load of 156.25 tons (350,000 pounds) on the main-hoist hook at 100-foot radius, and also that the pontoon have a freeboard of not less than 2 feet when lifting the maximum test load at the maximum radius in any direction with no wind.
Using the dimensions for the pontoon required by the specification drawings, and with the estimated weight of the entire floating crane as set forth in the defendant’s “Crane Data” table on Navy drawing 271987, and with the boom extended at right angle over the side at 100-foot radius and supporting the test load of 156.25 tons with no wind, the pontoon would have had a list and draft to the extent that there would have been only a .81-foot freeboard at the point where the aft sheer commenced.
In order that the specification regarding minimum free-board under the test-load conditions would be met, it was necessary that the entire weight of the floating crane be less than the total weight estimated by the defendant, or in the alternative, that the dimensions of the pontoon be enlarged to increase the volume of displacement.'
Since the dimensions of the pontoon were definitely fixed, the plaintiff in preparing its bid drawings and calculations, was required to calculate what the maximum weight of the floating crane could.be and still provide the minimum free-board. This weight was 3,890,000 pounds for the floating crane complete and 350,000 pounds for the maximum test-load, or a total of 4,240,000 pounds. The plaintiff then calculated that the minimum weights of the crane and pontoon could be 1,200,054 and 1,390,774 pounds respectively, to which were added a counterweight of 500,000 pounds, ballast of 799,172 pounds, and the maximum test load, for a total weight of 4,240,000 pounds.
*724 The total estimated weight of each floating crane, as set forth in the table on “Crane Data” in the defendant’s specification drawing, was 4,668,000 pounds, or 5,018,000 pounds with the test load added.
While the plaintiff claims to have discovered this error in calculation of freeboard from the Navy specification drawing prior to submission of its bid, it neither notified the Navy of the mistake nor stated any exception in its bid on account thereof.
21. At the time the plaintiff was preparing its bid on the 125-ton floating crane contract, it was performing another contract for the Navy to provide a revolving crane superstructure in the conversion of a fixed-boom, one-direction, floating crane to a revolving floating crane. In the negotiations leading to the conversion contract, the plaintiff stated by letter that the plaintiff’s proposed price was based on a turntable weight of 50,000 pounds, and requested that the contract provide for additional compensation at the rate of 10 cents per pound for fabricated structural steel and 3.6 cents per pound for its delivery and erection, for each pound of overweight. The conversion contract, executed October 10, 1941, provided that the price of $197,000 was predicated on the base below the roller path being 26 feet square, and it was stated that if the base exceeded that size, an adjustment in the contract price would be made on the basis of 10 cents per pound for the structural steel in excess of that required for a 26-foot square base. The plaintiff also had an overrun on this conversion contract, and was processing his claim on account thereof during the time it was constructing the 125-ton floating cranes.
No language regarding overrun in weight was requested or included in the contract in issue in this case. There is no evidence that such a clause was ever intended by the parties, or that it was omitted through mistake. The evidence shows that the plaintiff carefully reviewed the proposed contract and requested changes only concerning elimination of liquidated damages for delay in performance, prompt shipment upon completion of fabrication, fixing termination date on warranties, and manner of payment.
*725 22. The stresses caused by the trochoid wave condition in specification 4-01 (a) (2) were not considered by the plaintiff in the preparation of its bid proposal and “W” drawings. The plaintiff’s chief engineer, Mr. Paul Blackman,, under whose supervision and direction the bid drawings were prepared, was not then familiar with the effect of trochoid waves, but caused the drawings to be prepared on the theory that a crane constructed to meet the stresses resulting from the operating conditions would automatically cover the stresses caused by the trochoid wave.
The trochoid wave condition was first explained to Mr. Blackman when he called on Mr. Wagstaff about the latter part of October or the first part of November 1943. Mr. Wagstaff took him into a Navy library and obtained a book for him on the subject. When the plaintiff eventually submitted a trochoid wave diagram, it was drawn upside down.
23. The Navy specification drawings were merely outline sketches giving the reaches of the cranes and dimensions of the pontoons. They presented no design with the location and sizes of the steel members of the cranes. In order to calculate the stresses, sizes and exact weights of the various members of the cranes, the Navy would have been required to prepare numerous complete and detailed design drawings, which Mr. Wagstaff never undertook to do.
Any competent engineer reviewing the Navy specifications and drawings would have realized that the Navy drawings were only a general idea of a crane, that the successful bidder would be required to develop a complete set of designs which would conform to the specifications, and that the weights estimated by the defendant could not reasonably be relied upon in computing the bid.
Mr. Wagstaff had been studying and working with trochoid wave conditions since 1935, and deliberately inserted the trochoid wave condition in the specifications because of the planned use of the cranes. The evidence does not show that there was any mutual mistake concerning the effect of inserting the trochoid wave condition in the specifications.
24. The plaintiff claims that its “W” drawings submitted with its bid proposal became a part of the formal contract. Aside from the construction to be given to the terms of the *726 contract documents, it is found that neither party asserted before or during the contract performance that these drawings were part of the contract, or treated them as such. They were never endorsed as approved by the Navy, as in the case of all final submissions of design drawings. The Navy considered the “W” drawings as abandoned when the parties entered into the formal contract.
In its claim letter, dated February 25, 1946, hereinafter quoted in finding 35, the plaintiff described the “W” submissions as “preliminary drawings.” In its previously mentioned contract, dated October 10, 1941, concerning conversion of a crane superstructure, language'was inserted in typewriting on the printed form, which included the plaintiff’s bid drawings as part of that contract. No such language is in the contract in issue, nor was it requested, nor omitted by mistake.
The W-6 drawing stated the sizes of the steel members of the pontoon, but with respect to the superstructure of the floating cranes, the “W” drawings, even though drawn to scale, did not purport to state the sizes and weights of the various members in the parts and sections of the crane. As stated on their faces, they were drawings of the “general” assembly. They were not detailed design drawings from which a crane could be built. They showed only some of the individual members of the crane superstructure and none of the stresses on any of them. The stability calculations in W-5 drawings concerned large segments and sections of the crane, and do not purport to cover the specification stresses on individual parts. Without the details as to the weights, sizes,- and locations of the members, it was not possible for a competent engineer to compute either the stresses or weights of the crane superstructure.
' It is found that neither party intended that the “W” drawings were part of the contract between the parties, binding upon the parties as to the weights stated therein.
25. In compliance with specification 1-12, after acceptance by the defendant of the plaintiff’s bid, the plaintiff commenced the preparation and submission of detailed design drawings. In the interest of supplying material for early consideration by Mr. Wagstaff and his Navy engineering *727 staff, the original submissions were incomplete and not. in final form. For this reason and as a result of corrections by the Navy, two or three, and sometimes more resubmissions were required on each drawing.
The plaintiff designated its tables on stability calculations as its D-l drawing. These tables were similar in form to the plaintiff’s W-5 drawing, mentioned in finding 11 above. Four submissions of the D-l drawings were made on November 29, 1943, March 13, 1944, March 20, 1945, and June 5, 1945. The following table is an abstract from the second and fourth submissions, showing the itemized parts and their respective weights, together with the computed increases (or decreases) :

The second submission was marked by the Navy with the following language, printed and underscored in large, orange lettering: “To be revised when more definite data is obtained and then resubmitted”. Both the* second and fourth submis *728 sions were endorsed by the Navy: “Approved except for corrections noted and subject to the requirements of Contract NOy-6303, Spec. 11264”. The approvals were dated respectively March 30,1944, and June 27,1945. The corrections noted on the submissions did not purport to change any of the above-enumerated weights. The total weight of the crane as built was the same as the total of weights contained in the fourth submission.
Throughout the time involved in the submission and resubmission of the D-l tables on stability calculations, the plaintiff proceeded with the submission and resubmission of the detailed design drawings showing the location and sizes of the individual steel members and parts of the crane. The Navy never undertook to change the basic designs proposed by the plaintiff, but directed corrections thereof to meet the specification requirements.
26. Aside from the estimates contained in the “Crane Data” table on the Navy specification drawing, the specifications do not contain any language concerning the weight of the crane or pontoon, or any of their parts.
The following table sets forth the total weight of the crane and of the pontoon, as contained respectively in the Navy drawing, the plaintiff’s W-drawings, the Dravo bid computations, and the Wellman bid estimates, together with the weights as finally built:

The above weights were exclusive of the counterweight and ballast. In a schedule attached to his claim letter dated March 5, 1945, hereinafter quoted, the plaintiff stated the weight of the pontoon as shown in its “W” drawings to be 1,607,057 pounds, which estimate was 128,263 pounds more than the pontoon as built. Mr. Meyerstein testified at the trial that computations from the “W” drawings showed that *729 the.proposed weight of-the pontoon was 1,390,774 pounds, which was 88,020 pounds less than the pontoon as built.
27. Considerable testimony and documentary evidence was adduced without objection, which related to delays in the submission, processing, and approving of the design drawings. There is no proof of damages resulting from any such alleged delays, but the attendant circumstances seem relevant to the other issues in this case.
On December 8,. 1943,. the Navy wrote the plaintiff in part as follows:
To date very few drawings, calculations or schedules have been submitted which indicates that poor progress is being made.
In view of the magnitude of this contract and the large amount of work necessary, you are requested to furnish the Bureau with complete information as to how you propose to effect the construction of these cranes. * * * These cranes will be urgently needed for Naval activities, and it is important that you exert every effort to meet the contract date.
On December 13, 1943, the plaintiff replied to the Navy in part as follows:
In compliance with your request, we are preparing and will forward to you at an early date, a progress schedule for your approval.
However, we believe that your inference that “poor progress is being made” is not factual. Your Engineering Department can inform you of our many conferences relative to this contract, involving discussions and decisions regarding structural mechanical and electrical work primary to actual design. In addition, we have completed considerable research and study on both the crane and barge, which, we believe, is a necessary requirement on work of this magnitude.
To date we have submitted the following formal design drawings for approval:
Drawing W1 to W6 inclusive_ 6 drawings
Drawings 114D1 to Dll inclusive_11 drawings
Drawings 114-D15 to D17 inclusive— 3 drawings
Proposed emergency power connections _ 1 drawing
This makes a total of 21 drawings on which we have received informal approval from your Engineering De *730 .partment, but have as yet to receive formal approval from you.
To this letter tbe Navy replied on December 27, 1943, stating in part as follows:
The twenty-one (21) drawings which you have submitted to the Bureau are preliminary drawings and will require considerable work before they can be considered as completed.
'' On January 7 and 19,1944, the Navy by letters made further requests for a progress schedule of estimated dates for completion of various phases of the work and for submission of drawings for approval. The plaintiff submitted an incomplete progress schedule on January 20, 1944, and the Navy immediately requested resubmission. On February 2, 1944; the plaintiff forwarded a second progress schedule which was also incomplete and showed that the plaintiff had no estimated dates of completion for substantial parts of the work. It was then apparent that the plaintiff would not be able to meet the contract completion dates. On February 8,.-1944, the Navy again wrote the plaintiff, urging that “in order to speed the work up you are requested to advise as to what the Bureau can do to assist you.” In reply, the plaintiff estimated “that the designs and assemblies you require are 70% completed and that orders have been placed for 85% of the equipment and materials required although we have formal approval on very few drawings.” The plaintiff further requested advice as to the Navy’s plans for erection of the cranes because they would “govern the manner and size of the fabricated sections.”
■ On February 23,1944, the Navy wrote the plaintiff a complete report on the status of all drawings submitted to date, showing that 58 drawings had been submitted with but 10 approvals. Of the balance, 8 had been recently received, 14 had been reviewed and were ready for return to the plaintiff, 2’ were being processed, 17 were incomplete and required additional information, 1 had been returned with corrections, and 6 were information drawings only, and not vital to the work.
28. The Navy did not unreasonably and unnecessarily delay the consideration and approval of the design drawings, *731 and the corrections made by the Navy were reasonably necessary to meet the specifications.
Throughout the contract performance and as late as October 24, 1944, the plaintiff expressly asserted that delays in performance resulted from operation of the priorities system. The Navy obtained and had assigned to the contract the highest available priority rating and endeavored to have the War Production Board issue a special directive to make all required material immediately available.
29. By letter dated March 17,1944, the Navy requested the plaintiff to provide a breakdown of costs experienced to date in the way of overhead and engineering work on the pontoons, cost estimates of shop assembly and fabrication thereof, and cost estimates on their erection and launching. On March 30,1944, the Navy terminated the plaintiff’s contract with respect to the pontoons as related in finding 14, leaving, however, the designing of the pontoons to the plaintiff.
By letter dated June 9,1944, the Navy wrote the plaintiff in pertinent part as follows:
As agreed in conference of 6 June 1944, reference (b), the beam of the pontoons for the subject contract shall be increased from seventy-five feet to eighty-one feet. The original dimensions did not provide a pontoon with sufficient stability under extreme loading conditions. The increase in beam shall be accomplished by the addition of a three foot wide strake along both sides of the pontoon.
Your calculations for stability as shown on the above drawings should be revised as required by the increase in beam width and resubmitted for approval.
The pontoons were designed and constructed with the increased beam designated;
30. The plaintiff claims that the excess steel was required to meet the trochoid wave stress specifications because of the refusal of the Navy to permit the use of “holddown” and “tiedown” devices, in violation of the contract between the parties. It is the plaintiff’s claim that the wave stress specification 4 — 01 (a) (2) is a non-operating condition, and that when such condition was anticipated or arose, the crane would be revolved or rotated and the boom placed on the *732 boom rest in its towing position, and that the stresses from the waves would then be met by locking the rotating platform to the pontoon by holddown devices and by lashing the boom to. the pontoon by tiedown lines. Since it would require 4 hours to lower the boom from its operating position onto the boom rest, Mr. Meyerstein testified that the plaintiff planned to use a secondary set of tiedowns when the boom was in operating position but not operating, extended over the front end of the pontoon. The crane could be completely revolved in about three minutes, and consequently quickly placed in that position. The plaintiff claims that the crane superstructure did not have to be internally strong enough to meet the stresses imposed by the y20 trochoid wave.
The type of holddowns and tiedowns which the plaintiff claims to have intended to use for this purpose included the holddowns pictured in defendant’s exhibits 3A and 58, and also shroud lines which could be drawn tight between the boom and the pontoon.
31. The only express mention of holddowns in the contract documents is in specifications 4-01 (c) (2) and 5-14 providing for holddowns to lock and hold down the rotating structure. There is no statement about shroud lines or tiedowns to lash or tie the boom to the pontoon. The holddowns provided in specification 5-14 were intended to accommodate the stresses imposed under conditions stated in specification 4-01 (c) (2) but not under 4-01 (a) (2). It would be apparent to any competent engineer that the language “when the crane is being towed at sea”, contained in specification 5-14, contemplated the crane with its boom in towing position on the boom rest.
32. Mr. Meyerstein testified that about the latter part of October or early part of November 1943, which would have been at or very close to the time Mr. Blackman and Mr. Wag-staff had their previously-related meeting concerning the trochoid wave, Mr. Meyerstein met with Mr. Wagstaff and stated that the plaintiff had very carefully investigated the stress effects of the trochoid wave and found that for such a non-operating condition, the only way to safeguard the floating crane would be by means of holddowns and tiedowns, and for that reason, the plaintiff had made no stress analyses *733 of what would happen to the various members when the trochoid wave was present. Mr. Meyerstein claims that Mr. Wagstaff then stated that nevertheless he wanted the plaintiff to prepare stress analyses without the use of hold-downs and tiedowns, because the trochoid wave was new to him and to the Bureau. Mr. Meyerstein then allegedly said that he would prepare the analyses, but that if the tiedowns were eliminated, the crane would be much heavier, would cost a lot more money, the required freeboard would be lost, and the stability endangered. Mr. Wagstaff is claimed to have said that he merely wanted the stress analyses for his own information.
The plaintiff first submitted stress analyses on the y20 trochoid wave and other conditions on January 8, 12, and 21,1944.
Mr. Meyerstein also testified that in April 1944 Mr. Wag-staff told him that the Bureau engineers had held a meeting, that they had decided that they did not want to use the plaintiff’s plan of supplying tiedowns to meet the wave stresses, and that the Bureau was directing him to increase the weight of the crane in lieu of tiedowns. He further stated that Mr. Wagstaff said that the Navy wanted the tiedowns, too, because they were required by the contract.
Mr. Meyerstein said he complained about the increased cost, and was directed by Mr. Wagstaff to discuss that matter with Mr. Anderson, with whom he allegedly conferred immediately. He said he told Mr. Anderson that the direction of the Bureau was wrong and that the plaintiff was going to stop work. Mr. Meyerstein stated that he asked about additional compensation, and that Mr. Anderson replied that the Bureau expected to pay nothing because the contract provided that the Bureau could make any change desired, and the plaintiff had to comply, subject to making a claim or appeal as provided in the contract. Mr. Anderson allegedly said that the plaintiff had better change its mind about stopping the work, or the Bureau would find it in default, and then the plaintiff would really be “in a jam”. Mr. Anderson is supposed to have related how a contractor in Hawaii defied the Bureau, which put him in jail for impeding the war effort. Mr. Meyerstein further stated that by that time he *734 was “good and mad” and that he asserted that he would return to his office and write a stiff letter of protest. Mr. Anderson is then supposed to have warned Mr. Meyerstein not to send a letter threatening or casting aspersions on the Bureau, that the Bureau would not give the plaintiff anything in writing on the direction, that the revised drawings would form a basis of action by the Board of Appeals, and that he (Anderson) would endorse the plaintiff’s claim and pass it on to higher authority.
The plaintiff never stated or made reference to any such dealings, conversations or threats in any letter or claim transmitted to or filed with the Navy Department, or in any administrative proceedings, or in fact, in the petition on file in this case. Mr. Meyerstein testified that he had never reduced to writing his statements about holddowns and the alleged directions to- add weight prior to the trial of this case. As the reason for its failure to do so, the plaintiff assigns the threats allegedly made by Mr. Anderson.
Mr. Wagstaff and Mr. Anderson both testified on these subjects and their testimony was in direct conflict with that of Mr. Meyerstein. They testified that no mention of hold-downs was made by Mr. Meyerstein in October-November 1948 or April-Mazy 1944, and that no such conversations had ever occurred. Mr. Anderson stated that it was not until the latter part of 1944 that Mr. Meyerstein first asked for additional pay because the cranes had exceeded estimated weights, but that no mention of holddowns was made to him even at that time. Mr. Anderson said he then explained to Mr. Meyerstein how to file a claim for additional compensation and advised that all facts be stated as clearly as possible and that substantiating documents be submitted. Mr. Wag-staff stated that no statement was ever made to him about tiedowns during the entire contract period, but the first mention thereof was made by plaintiff’s representatives in a conference held at the Department of Justice after the petition was filed in this case. Mr. Wagstaff stated that in March 1944 Mr. Blackman came to him and asked permission to use holddowns, but made, no mention of tiedowns or ropes. They went over the specifications together, and Mr. Wag-staff explained to Mr. Blackman that the crane had to be *735 constructed to withstand the wave stresses with- boom at maximum radius as stated in specification 4-01 (a) (2), and that he would not allow the plaintiff to satisfy that condition with holddowns, as it would be a change in the contract.
33. A consideration of all of the evidence in this case reveals certain facts with respect to holddowns and tie-downs.
First, the horizontal thrust increased from about 248,000 pounds to about 700,000 pounds due to the 1/20 trochoid wave condition, with the boom extended longitudinally in operating position, and holddowns and tiedowns could not have absorbed such stresses.
Second, a competent engineer would have construed specification 4-01 (a) (2) as meaning that the stresses resulting from the conditions therein stated, could not have been met by the use of holddowns, and that the crane boom itself would have to absorb such stresses.
• Third, the plaintiff’s chief engineer, Mr. Blackman, testified- that the only holddowns considered by the plaintiff in the preparation of its bid were those éventually used, -pictured in defendant’s exhibit 58; that the holddowns were intended to meet the stresses under specification 5-14 but not to absorb the stresses in the center castings under specification 4-05 (c); that the holddowns would not absorb horizontal load but only vertical load; and that the plaintiff originally planned to use shroud-line tiedowns. In this connection Mr. Blackman admitted that in a telephone conversation with the defendant’s attorney he had advised that Mr. Meyerstein had recently discussed with him the question of tiedowns and that he had told Mr. Meyerstein that he had no recollection of ever having planned to use tiedowns.' Mr. Blackman further stated that he had never discussed tie-downs with any representative of the Navy, that the plaintiff had abandoned its plan to use tiedowns, and no design drawings were ever prepared for them. He also testified that it would not have been practical to use cables or shroud lines under the stress conditions of specification 4-01 (a) (2) because the “boom would be up kind of high, and I wasn’t sure that we would get an angle on that rope line that would be *736 worth very much. It was one of those things again that we would have to investigate later.”
Fourth, Mr. Blackman testified that he never made any investigation of tiedowns at any time.
Fifth, the basic design for the 125-ton cranes in suit was taken by the plaintiff from the design of the 50-ton crane which it had previously constructed for the Navy. No tie-downs were used on the smaller crane.
Sixth, no mention was made by the plaintiff of holddowns or tiedowns in any letter, claim or document or in any administrative proceedings.
Seventh, holddowns were used in the cranes as built, to lock the rotating platform to the crane base. No tiedowns were designed or employed.
34. Mr. Meyerstein also testified that on February 17, 1945, Mr. Anderson came into the plaintiff’s office during the course of a tour of inspection of the contract performance, and that Mr. Meyerstein asked Mr. Anderson how he could be paid for the change that had been directed in the contract. Mr. Anderson was supposed to have replied that the Government had a right to make any changes or additions to the contract without paying for them, and that the only recourse was to file a claim or make an appeal. Mr. Meyerstein then testified that he told Mr. Anderson that whatever he had to do, he wanted to do, because he needed the money. Mr. Meyerstein further related the conversation in the form of quotations, as follows:
“Well,” he [Mr. Anderson] said, “when the engineers decided to make this crane heavier, they had it in their minds that such increase was provided for under the contract, and that consequently, under the strict interpretation of the contract, you are not entitled to payment.” Then he said, “But if you want to make a claim and you have a basis for the claim that can be considered, I will be very happy to do anything that I can in my position to assist you.”
“Well,” I told him, “as to the basis of the claim, the only basis I have is that the Bureau was very arbitrary in directing me to increase these weights. In fact,” I said, “now you can see how the thing worked out. It actually has worked out the way I told the engineers it *737 would work out. And,” I said, “as far as I am concerned, the engineers acted in an irresponsible way.”
He told me that if that was going to be the basis of my claim, I might as well forget it. He said, “The Bureau is not going to give you consideration, and I, for one, will have no part in it if you are going to blame the Bureau for errors, or if you are going to put any individual or indviduals on a spot.”
I said, “Well, if I can’t tell the truth about what happened in view of what has gone on and that we can all see, what am I to say ?”
He said, “Well, you have to go into this thing on the basis that you are appealing, that you are depending upon the Bureau’s sense of equity.” Those weren’t the words he used.
He said, “On that basis, what you should do is just put in a claim and,” he said, “take the blame, and if we think you should be paid, probably a Board on Changes will be nominated, and at the Board on Changes hearing, you will have an opportunity to see what can be done as to getting paid for the extra weight.”
“Well,” I said, “I certainly don’t want to take the blame, because it is- not my fault.”
He said, “I don’t care what you do, but don’t blame the Bureau.” He said, “Make it a case of mutual error. Say that you both did not understand.”
Mr. Meyerstein further asserted that he requested permission of Mr. Anderson to make notes, that Mr. Anderson consented, and that he made notes of the conversation, from which he allegedly composed the claim letter set forth in the next succeeding finding.
Mr. Anderson had the testimony of Mr. Meyerstein concerning this conversation read back to him in the course of his direct examination, and denied that any such conversation took place. He stated that he could not recall meeting with Mr. Meyerstein on February 17,1945, but it was possible that he did. He said that Mr. Meyerstein had at some time discussed with him the matter of making a claim for overrun in'weight, but had-never mentioned to him any technical aspect of the contract, such as trochoid wave stresses. He said he did not tell Mr. Meyerstein what to put in his claim, but only explained the procedure to be followed, and suggested that the claim be supported by documents. He denied making the statement that the Government had a right to *738 make changes without paying for them, or that the plaintiff had better withhold criticism of the Bureau, or that the plaintiff’s claim should be based on mutual error, or that Mr. Meyerstein ever requested and was given permission to make notes of any conversation with him, or that he told Mr. Mey-erstein what to state in the claim letter, quoted in the next finding.
The alleged notes of the conversation are not in evidence. Mr. Meyerstein testified that he did not keep them once he had composed the claim letter.
35. By letter dated March 5,1945, the plaintiff first made a written claim for increased costs on account of overrun in weight. Addressed to the Navy Department, Bureau of Yards and Docks, Attention: Mr. R. E. Anderson, and signed by Mr. Meyerstein, the letter states as follows:
Referring to the conference in our office of February 17 at which time there were present Lt. Comdr. Goodwin and Lieut. Anderson, of the RINM office in Brooklyn, for your information we have compiled and attach a comparative tabulation of crane and pontoon weights:
You will note that the final weights of the cranes and pontoons are considerably in excess of the weights contemplated in our original proposal, which was accompanied by our drawings W-l to W-6 inclusive. At that time a comparison of your estimate of weights, as shown on your contract drawing No. 271987, with our proposal drawings W-l to W-6 indicated that both estimates of crane weights were in agreement, although our pontoon weight was considerably less than yours.
In analyzing the final weight tabulations, it is determined that this tremendous increase in weight is mostly due to the design requirements imposed by Par. 4-01 (a) (2) and Par. 4-01 (c) (2) of the contract specifications covering the Jib, A-Frame, Rotating Platform, Base, holddown devices and boom rest. In Par. 4r-01 (a) and (c) three design conditions were to be met:
1. Conditions imposed by operational requirements.
2. Conditions imposed by Roll caused by %0 trochoid wave.
3. Conditions imposed by Wind — Jib at minimum radius.
Usually design conditions are listed in the order of their importance, and operational requirements has been found to be the critical design requirement, all other re *739 quirements being automatically met when operational requirements has been satisfied.
In preparing the bid proposal, because of time restrictions it was obviously impossible to make a complete crane design. Therefore, we naturally chose what both we and the Bureau believed to be the critical design requirement. Thus, when our crane stability drawing W-5 was prepared our design weights were in substantial agreement'with' those of the Bureau.
As the design of the crane was developed, it became apparent that design condition #2 and not #l was the critical design condition. This matter was called to the attention of the Bureau Engineers, who were as surprised as we were, and who carefully checked all our calculations and found them to be correct. Even then, it was not apparent how much additional crane would be required to satisfy design condition #2, and it was only after all structural and mechanical details were completed that it became certain that the finished crane would be much heavier than originally contemplated either by us or the Bureau.
Naturally, Contract NOy 6303 was entered into and executed on the assumption that the finished product would approximate in weight the product shown on our proposal drawings, inasmuch as our preliminary designs checked your own findings. However, the tremendous increase in the weight of these cranes has proportionally increased the cost beyond all reason, to the extent that a sizeable monetary loss has already been entailed making it necessary for us to seek relief.
Accordingly, we respectfully request that you favorably consider the various facts herein outlined in order that we may request and obtain a change order covering a reasonable increase in the contract price.
The estimated and actual weights of the pontoon and superstructure, contained in the schedule attached to the letter are those set forth in finding 26, except that the estimates of other bidders were not stated therein.
36. By letter dated April 27, 1945, the. Bureau replied as follows'
The Bureau has reviewed your letter, reference (a), relative to the discrepancy in weights between those contemplated and those of the completed crane. ' It is noted 'that the Bureau’s estimated weight was 3,402,000 pounds whereas the actual weight is 3,157,557 pounds. The statement made in the second paragraph of reference (a) *740 therefore appears to be an error since the Bureau’s estimated weight is more than the actual weight.
The terms of the contract provide that you shall furnish the cranes complete in accordance with certain requirements, all of which were clearly set forth in the specifications and known to you before you submitted your pro-Eosal. No appreciable change in these specifications has een made, and consequently no change to the contract increasing the contract price can be made.
It is not believed that any relief can be given on account of alleged errors in your estimate and preliminary design.
37. By letter dated May 7, 1945, addressed to Admiral Ben Moreell, Chief, Bureau of Yards and Docks, the plaintiff stated that on this contract “it was necessary to supply more rugged cranes than were originally contemplated by the Navy or envisioned in our Contract Proposal” and requested Admiral Moreell to appoint a Board on Changes “to discuss and authorize a change order.”
By letter dated June 6,1945, the Bureau reviewed the contents of the plaintiff’s letter of Mai'ch 5 and May 7,1945, and stated further as follows:
You are advised that under the contract, the Bureau must hold that all design requirements had to be met; that your proposal for a crane meeting the specific requirements for the lump sum contained no provision whereby payment could be made for any overrun of weight in excess of that which you contemplated at the time of submitting the proposal. Accordingly, it is held that no increase in contract price may be contemplated for you.
In this case you are advised that should you care to exercise your right of appeal to the Secretary of the Navy from this decision of the Contracting Officer, such action should be initiated within a period of 30 days from the date of this decision and that it should be in such form as proposed by the Board of Contract Appeals of the Navy Department.
38. By letter dated July 3, 1945, the plaintiff appéaled to the Secretary of the Navy, stated that the relief sought was “the additional costs entailed by the Contractor for furnishing 957,458 pounds of additional crane less 252,566 pounds of pontoon over and above what was originally contem *741 plated by both the Navy Department and the Contractor due to a mutual error”, and requested the opportunity to submit additional information and arguments. This appeal was duly referred to the Navy Board of Contract Appeals, and the plaintiff was notified by the Board that the case had been docketed for hearing at a date to be set convenient to both parties.
In the meantime, Mr. Meyerstein met Admiral Moreell in a corridor at the Bureau of Yards and Docks. The Admiral was personally acquainted with Mr. Meyerstein, and he advised that he had just returned from a trip on which he had seen the 125-ton cranes, and commented that he had had no idea that they were so large. Mr. Meyerstein mentioned the previous correspondence concerning overrun of weight, and asked the Admiral to give him a hearing before a Board on Changes. At the Admiral’s request, Mr. Meyerstein .subsequently wrote him a letter about the matter.
While the case was pending before the Navy Board of Contract Appeals, the Bureau by direction of Admiral Moreell appointed a Board on Changes composed of two Navy officers and Mr. Meyerstein. On making its investigation, this Board did not hear either Mr. Anderson ór Mr. Wagstaff, nor call for any of their records.
On December 18,1945, the report of the Board on Changes, signed by the two Navy officers and Mr. Meyerstein, was forwarded to the Chief, Bureau of Yards and Docks. Admiral J. J. Manning had recently succeeded Admiral Moreell as the Chief. The report stated in part as follows: ■
5. The design requirements as stated in. paragraph 4-01 of the specifications impose three, conditions, namely:
(a) operational requirements.
(b) crane roll due to wave action with boom extended plus wind.
(c) wind action with boom up.
The contractor has stated that his preliminary design which accompanied negotiations leading to the award of an informal contract was based on the first condition, namely, that imposed by operational requirements, in the expectation that other conditions would be automatically met. As the original estimated weights checked fairly closely with the crane data furnished by the Bu *742 reau be considered that he was making a correct preliminary-design assumption and that the cranes could be priced accordingly. There is no record that he was warned or otherwise given reason to believe that the actual case would be different. Under conditions existing in the United States at that time fast action was imperative and the Anthony M. Meyerstein Company was awarded the contract notwithstanding the fact that they could not show previous experience in designing and constructing cranes of this magnitude. In fact, their record of previous cranes constructed for the Bureau began in 1940 during the period of the National Emergency and has covered the war only.
6. The Board strongly believes that under the conditions existing at the time, consideration should be shown to a contractor undertaking new designs and construction of a capacity beyond his normal work. From the best evidence obtainable, the Board also believes that the Bureau as well as the contractor thought that detailed designs would bear out the weights as originally calculated in the preliminary designs, otherwise, the Bureau would have further negotiated the price prior to making the award. Thus an element of mutual error entered the preliminary and contractual negotiations and a true meeting of the minds did not in fact exist.
7. The Board finds that the completed design showed that the condition of wave action had a material bearing upon the final weight of the crane boom and superstructure necessitating both a larger pontoon and heavier superstructure. Consequently, because the contractor entered the contract in apparent good faith and received an acceptance by the Bureau of preliminary drawings and price, the .Board recommends that an increase in contract price to cover the additional materials and workmanship actually performed should be allowed and recommends that a change order worded substantially as follows be issued:
“For the increase in the weight of the cranes proper over and above that originally contemplated and for the decrease in the weight of the pontoons below that originally contemplated the contract price be increased by the amount of $264,424.62 as shown in estimate sheet attached herewith as enclosure.”
The attached schedule showed a breakdown of the contract price of $1,158,600 on a poundage basis. The Board listed the weight figures from the plaintiff’s “W” drawings as fol *743 lows: 1,670,056 pounds per pontoon and 1,200,000 pounds per crane. Ten cents per pound was allowed for the pontoons, and 31.7 cents per pound for the cranes, which when added to a fixed amount for pontoon fittings, aggregated the contract price.
Applying the same rates per pound to the weights of the cranes and pontoons as built, as computed by the Board, that is, 1,676,783 pounds per crane and 1,480,777 pounds per pontoon, and adding the same fixed amount for fittings, the total actual cost was computed to be $1,423,024.62, or $264,424.62 in excess of the contract price.
39. By letter dated January 11, 1946, Admiral Manning as Chief, Bureau of Yards and Docks, disapproved the report of the Board on Changes, and stated further as follows:
2. This is the second instance wherein the Chief of Bureau has been compelled to disapprove a Board Report submitted by the personnel of this Board under this contract. In each instance there was definite indication that the Board had not thoroughly and completely discharged its duties and responsibilities.
3. It is directed that the Board as now constituted be dismissed.
4. The Chief of Bureau will appoint a new Board for reconsideration of changes and alleged claims submitted under the contract.
40. After dismissal of the Board on Changes, Admiral Manning advised the plaintiff by letter dated February 15, 1946, that the Navy Board of Contract Appeals had requested the Bureau to process the case in accordance with the rules of the Board, that the Board had accordingly instructed the plaintiff to forward to the Bureau all data and additional information in support of the appeal, and that the plaintiff should promptly comply.
Admiral Manning advised that in accordance with his previous statement that a new Board on Changes would be appointed, the plaintiff’s claim had been referred to the Bureau’s standing Board for Contract Awards, before which the plaintiff could appear in person or by representatives and submit additional data, information and arguments.
By letter dated February 25,1946, the plaintiff replied and restated its case on a theory of mutual mistake, using much *744 of the language contained in the report of the Board on Changes. In this letter, the plaintiff stated in part as follows:
The contractor also had prepared some preliminary-drawings known as W-l to W-6 inclusive which indicate that the cranes would weigh 1,200,000 pounds and the pontoons would weigh 1,670,056 pounds. The weights in the contractor’s crane drawings were in substantial agreement with the Bureau’s crane data as shown on ~Y & D drawing 271,987. Drawings of the contractor W-l to W-6 are not mentioned in the contract. However, the contract provides that the contractor should furnish a complete design subject to check of all drawings and approval of the Bureau. No objection was found and no design faults were known to exist in the preliminary drawings, W-l to W-6. As the design was developed, it revealed that the weights originally shown on the Bureau’s drawing as estimated and approximate would be considerably increased in the crane superstructure and boom and that a much heavier crane would result when all specified requirements for strength and stability under specified conditions of wave action and wind action were made.
* * * * *
It is the Contractor’s contention that the increased weight of the cranes in the net amount of 287,504 pounds each represents a change under the contract for which he should receive a change order providing an increase in the contract amount.
The plaintiff requested that action by the Navy Board on Contract Appeals be deferred pending the decision by the Bureau’s standing Board for Contract Awards.
41. On March 20, 1946, the Bureau’s Board for Contract Awards held a hearing on the plaintiff’s claim, and a transcript of the testimony of Mr. Meyerstein was prepared and is in evidence in this case. Mr. Meyerstein was asked to explain why the weights of the completed crane so greatly exceeded the weights on the “W” drawings. By way of answer, he read verbatim the second through the fifth paragraphs of the plaintiff’s claim letter quoted in finding 35, ending with the statement that “the finished crane would be much heavier than originally contemplated either by us or the Bureau.”
*745 Mr. Meyerstein also testified before this Board that Mr. Blackman, his chief engineer, approached him when the design of the crane was pretty well advanced, and when they had just started to check the sizes and weights of the various members to meet the trochoid wave condition, and stated that the stress requirements were so severe that they could not be met by satisfying the requirements of the operating conditions. He further testified that he then requested Mr. Blackman to take the matter up immediately with the Bureau and find out what could be done.
42. By letter dated May 29, 1946, Admiral Manning advised the plaintiff that the Bureau’s Board for Contract Awards had disallowed the claim for overrun of weights, and further stated as follows:
The review of 'all correspondence, contract documents, and the additional data presented by you at a Board meeting held in the Bureau of Yards and Docks on 20 March 1946 indicates that there is nothing which entitles you to additional compensation for increased weights of steel in the cranes as actually constructed over those weights originally estimated by the Bureau of Yards and Docks, nor does the Board find any action on the part of the Government or its agents which would justify such additional compensation. On the other hand, the Board finds that you alone were responsible for the details of the design which resulted in heavier superstructures for the cranes than originally estimated by the Bureau of Yards and Docks. Furthermore the Board finds that the total weights of the cranes including the pontoons as finally constructed were less than the total weights originally estimated. You exercised good engineering judgment and skill in the design of the pontoons with a major saving in steel from that in the preliminary estimate of the Bureau, but did not exercise the same skill in the design of the crane superstructures with a resultant increase in weight of steel. The Board recommends no change in the contract on this account and further recommends that your claim for additional compensation for the alleged increased weight of the cranes be not approved.
43. Following the decision of the Board for Contract Awards, the Bureau prepared and transmitted to tbe Navy Board for Contract Appeals detailed findings of fact, which in their pertinent parts stated “* * * On 5 March 1945 the *746 Contractor first claimed extra compensation for overrun in material on the crane superstructures. * * * The Contractor’s drawings W-l through W-6 never became a part of the subject contract. * * * Prior to its claim of 5 March 1945, there has never been any suggestions by the Contractor that it understood that drawings W-l through W-6 accompanying its bid proposal should become part of the contract. * * * On 13 January 1944 the Contractor sent the executed contract to the Contracting Officer, (h) There was no further correspondence and there were no verbal communications until 5 March 1945, which in any way touched upon the matter which had been included in the formal contract, although at some time prior to 21 January 1944 the Contractor must have become aware that it was very substantially running over in weight above the weight shown on its drawing W-5 for certain members of the crane. * * * In its claim letter of 5 March 1945, the Contractor urges that both it and the Contracting Officer were mistaken at the time the contract was let in believing that the load combination set forth in sub-pai’agraph (2) of Section N01, sub-paragraph (a) and (c), was of no importance. The Contracting Officer did consider this condition, as well as each other condition, in arriving at its estimated and approximate weights. There is no evidence that the Contractor did consider this condition. * * * That there was no reliance by the Contractor upon the weight indicated by the Contracting Officer as estimated and approximate is shown in its claim letter of 5 March 1945. * * * The Contractor was very slow in getting the Contract work under way. The delay was caused largely by slow submission of drawings and submission of drawings which substantially failed to comply with the specifications, and by late placing of orders for critical materials. * * *”
44. By its written decision dated May 12, 1949, the Navy Board of Contract Appeals dismissed the plaintiff’s appeal on the ground of lack of jurisdiction. The Board relied upon the plaintiff’s representations that the appeal involved no dispute concerning questions of fact arising under the contract and that the claim was one for breach of contract. The Board’s decision, in part, stated:
*747 6. Appellant has represented to the Board that its claim is a claim for damages arising out of a breach of contract. Appellant’s position, counsel has stated, is that the plans and specifications furnished to Appellant for bidding purposes misrepresented and misled the contractor as to the quantity of steel Appellant would be required to furnish in constructing the cranes. Counsel for Appellant has stated that he had no offer of proof of details that would bear on any other issue, and has in substance stated on Appellant’s behalf that the appeal is not based on any direction or order issued to Appellant changing Appellant’s contract performance.
45. From all of the evidence in this case, it is apparent that the plaintiff could have designed and fabricated the superstructures of the floating cranes so that they would have been substantially lighter in weight, and still have complied with the specifications and particularly the stress requirements of the trochoid wave condition with boom at maximum radius. The number of web members in the boom could have been reduced by using diagonal supports instead of heavy vertical members. In the plaintiff’s design, there was an excessive use of diaphragms or cross bracings between the sides of the boom. During the design stages, Mr. Wag-staff suggested to Mr. Blackman that some of the diaphragms be eliminated, but no changes were made in this respect in the design resubmissions. Considerable weight could have been saved by use of rolled H or I beams instead of extensive lattice work. However, the plaintiff’s failure to use such members resulted, at least in part, from lack of supply of rolled shapes due to war restrictions imposed on the steel mills. At least to the extent permitted within the practical limitations imposed by specifications 1-03, 1-08, and 2-10, the plaintiff could have used welding instead of the heavier riveted construction employed throughout the boom and A-frame. Extra heavy gusset and batten plates could have been reduced in size. There was an excessive number of members in the plaintiff’s design of the A-frame, which could have been designed considerably lighter in weight if various members had been relocated to absorb the stresses of both tension and compression instead of tension alone.
*748 The weight of the evidence in this case is that it was practical and possible to design and build a superstructure for the floating crane, which would meet the specifications and stay within the estimated weights set forth on the Navy specification drawing.
46. On all of the evidence in this case, it is found that the defendant did not negligently, carelessly, recklessly or otherwise misrepresent the weights of the cranes; that the plaintiff did not reasonably or in fact rely upon the Navy’s weight estimates; that the defendant did not threaten, coerce, or exercise any undue influence upon the plaintiff with respect bo the submission of design drawings; that the plaintiff voluntarily submitted design drawings which, when reasonably corrected by the defendant, resulted in the overrun of weight in the superstructures of the floating cranes involved in this case..
47. The fair and reasonable cost of the additional labor and material required to increase the weight of each superstructure of the floating cranes from the estimated weight of 1,200,054 pounds shown on the plaintiff’s “W” drawings to the 1,678,783 pounds as built, was the sum of $132,212.31, or a total of $264,424.62 for both floating cranes.
48. Various corrections of the plaintiff’s design drawings were reasonably made by the defendant for the purpose of meeting the trochoid wave condition as well as the other specification requirements. The plaintiff was required to follow these directions.
As the cranes were designed by plaintiff only part of the total overrun of weight was required to meet the stresses imposed by the trochoid wave above the stresses caused by the other conditions. The total amount of steel thus added was 225,250 pounds for both cranes. The fair and reasonable cost of the additional work and material thus required was $54,967.63 on both cranes.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.